IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARIE ST. LOUIS**, *Plaintiff* <br><br> v. <br><br> **NEW HUDSON FACADES, LLC**, *Defendant* | **CIVIL ACTION** <br><br> **NO. 23-cv-4516** |

**Baylson, J.**                                                                                                        **August 1, 2024**

## MEMORANDUM

### I.      PROCEDURAL HISTORY AND FACTUAL SUMMARY

On November 15, 2023, Plaintiff Marie St. Louis initiated this lawsuit against her former employer, Defendant New Hudson LLC. ECF 1. As discussed in this Court's prior Memorandum, Plaintiff's claims stem from her termination with New Hudson. St. Louis v. New Hudson Facades, LLC, 2024 WL 1333369, at *1 (E.D. Pa. Mar. 28, 2024). Plaintiff alleges that her termination on January 17, 2023 violated Title VII of the Civil Rights Act of 1964 and the American with Disabilities Act ("ADA"). Id.

On March 3, 2024, Defendant moved to dismiss Plaintiff's claims because she signed a general release, upon termination, that bars her from bringing Title VII or ADA claims. ECF 9. On March 28, 2024, this Court denied the Motion because that affirmative defense was suited for summary judgment, not 12(b)(6) evaluation. St. Louis, 2024 WL 1333369 at *2–3. Recognizing the potential significance of the release, this Court bifurcated discovery to develop whether Plaintiff knowingly and voluntarily entered into the release. ECF 20.

On July 1, 2024, Defendant moved for summary judgment, arguing that Plaintiff voluntarily and knowingly signed the release, and, therefore, was precluded from suing Defendant

1

in federal court. Def. Mot. Summ. J. ECF 22. On July 10, 2024, Plaintiff responded, Pl. Resp. ECF 25, and Defendant Replied. Def. Reply ECF 28.

A. **Undisputed Facts**

Plaintiff is forty-four. Def. Statement of Fact ¶ 7, ECF 22-3.[1] She was born and grew up in Haiti. Id. ¶ 8. She moved to the United States in 2015, at age 35. Id. ¶ 10. Prior to 2015, she lived in Haiti, where she spoke French and Creole as her primary languages. Id. ¶¶ 11–12. She obtained a high school degree in Haiti at age 23. Id. ¶ 19; Pl. Resp. Statement of Facts ¶ 19, ECF 25-3. When Plaintiff moved to the United States, she started to learn how to speak English. Def. Statement of Facts ¶ 23.

In June 2019, Plaintiff applied for a job as an Assembly Line Technician with Defendant. Id. ¶¶ 32–34. The position she applied for did not require that she speak English. Spatichia Dep. 31:16–20, Def. Ex. 8, ECF 22-12. She interviewed in English, was offered the position, and accepted it. Def. Statement of Facts ¶¶ 33, 37.

During her time at New Hudson, Plaintiff spoke with an accent and did not always speak grammatically correct English. Id. ¶¶ 44, 46. As part of her job, Plaintiff participated in weekly safety meetings, called toolbox talks, to review necessary safety measures at New Hudson. Id. ¶¶ 49–50. Those talks were in English. Id. Additionally, Plaintiff's annual performance reviews were in English. Id. ¶¶ 54–55.

On January 20, 2023, Defendant laid off 14 employees, including Plaintiff. Id. ¶¶ 60–67. Plant manager Richard Latella and Human Resources employee Rachel Spatichia conducted the meeting with Plaintiff. Id. They both spoke English during the entirety of the meeting. Id. ¶ 103.

---

[1] When citing to Defendant's Statement of Facts, this Court only deems assertions as "undisputed" that Plaintiff admitted to in her response, ECF 25-3.

When told she was being terminated, Plaintiff became upset and asked for her job back. Id. ¶¶ 95–96, 99.

At some point during the meeting, Plaintiff signed a Separation Agreement presented to her. Under the terms of the agreement, Plaintiff received two weeks of severance pay. Id. ¶ 77. In exchange, the agreement goes on:

> (b) In exchange for the benefits and obligations that are set forth and described in Paragraphs 1 and 2, above, consideration which Employee hereby acknowledges is in addition to anything of value to which Employee is already entitled, Employee generally and completely remises, releases, acquits and forever discharges Releasees from any and all claims, liabilities, demands, and causes of action whether known or unknown, fixed or contingent, suspected or unsuspected, accrued or unaccrued, which Employee had, may have, or has against Releasees, or any of them, including but not limited to (i) those for wrongful discharge, breach of contract, breach of implied contract, breach of implied covenant of good faith and fair dealing, and any other common law or statutory claims now or hereinafter recognized; (ii) those for discrimination (including but not limited to claims for discrimination, harassment or retaliation on account of sex, age, handicap, medical condition or disability, national origin, race, color, religion, sexual orientation, union affiliation, or veterans status) which Employee might have or might have had under the federal Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964, the Civil Rights Acts of 1866 and 1870, the Civil Rights Act of 1991, the Older Workers' Benefit Protection Act, the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act of 2008, the National Labor Relations Act, the Pennsylvania Human Relations Act, and any other federal, state or local laws prohibiting discrimination, harassment or retaliation in employment; (iii) those arising under the Sarbanes-Oxley Act of 2002; (iv) those relating to leave and/or the payment of wages, commissions, or bonuses, including but not limited to claims arising under the Family and Medical Leave Act, Fair Labor Standards Act, and any other applicable wage federal, state or local wage and hour and/or wage payments laws including the Pennsylvania Wage Payment and Collection Law and Pennsylvania Minimum Wage Act; and, (v) any whistleblower claims arising under federal, state or local statute or common law.
>
> **<u>BY SIGNING THIS AGREEMENT, EMPLOYEE AGREES TO GIVE UP OR WAIVE ANY RIGHTS OR CLAIMS WHICH EMPLOYEE MAY HAVE UNDER THE AGEDISCRIMINATION IN EMPLOYMENT ACT OF 1967, 29 U.S.C. § 621, ET. SEQ., OR ANY OTHER STATUTE OR LAW, WHICH IS BASED ON ACTIONS WHICH OCCURRED UP THROUGH THE DATE THAT EMPLOYEE SIGNS THIS AGREEMENT.</u>**

Separation Agreement ¶ 13(b), Def. Ex. 13, ECF 22-17. The agreement also barred the signee from suing New Hudson. Id. ¶ 13(f). Additionally, the agreement stated that the "**EMPLOYEE HAS BEEN ADVISED TO READ THIS ENTIRE AGREEMENT CAREFULLY AND TO CONSULT WITH AN ATTORNEY OF EMPLOYEE'S CHOICE PRIOR TO SIGNING THIS AGREEMENT**," was given forty-five days to consider before signing, and had seven days to revoke the agreement if she signed. Id. ¶¶ 12(a)-(c), (e).

### B. Disputed Facts

There are essentially two major disputes of genuine fact. First, what was Plaintiff's level of English comprehension, in conversation and writing, when she signed the agreement? And second, what did Spatichia, Latella, and Plaintiff say to each other at her termination meeting?

Disagreements over Plaintiff's English-language skill pervade the entire lawsuit. Plaintiff characterizes her employment with New Hudson as one where her job responsibilities required very little English communication, and when important matters did require English (i.e. the weekly training sessions), she used co-workers, her family, or applications on her phone to translate the information. Songa Dep. 21:4–22:2, 23:2–6, 27:21–30:1 (co-worker describing Plaintiff's English reading ability as "low") 34:19–36:14, Pl. Ex. D, ECF 25-7; Pl. Dep. 15:3–16:16 (Plaintiff describing her limited ability to communicate in English); 38:14–40:8 (stating she used coworkers to translate safety meetings); 46:21–47:4 (testifying that Defendant would give her answers to English-language safety quizzes), 144:19–145:5 (explaining she needed to use a translation app on her phone when texting with people in English), Def. Ex. 4, ECF 22-8. She buttressed her own testimony with another co-worker, Henry Songa, who testified that her English was very limited

4

and that she used other employees to help her translate. Songa Dep. 21:4-22:2, 23:2-6, 27:21-30:1 (describing Plaintiff's English reading ability as "low") 34:19–36:14.

Regarding the Separation Agreement and other employment paperwork, Plaintiff testified that she could not understand any of the relevant terms in the agreement—i.e. the release of liability. Pl. Dep. 162:17–24, 169:6–170:23. Defendant, on the other hand, insinuates that Plaintiff's command of English is greater than she lets on, and that she frequently spoke English at work. Def. Statement of Fact ¶¶ 13, 16, 22, 31–33, 41, 43, 47–48, 58. Indeed, the debate over Plaintiff's language-ability extends past her employment with Defendant. Defendant suggests that Plaintiff's studying to become a Certified Nurse Assistant ("CAN"), post-termination, shows she speaks English. Id. ¶¶ 113–18. Plaintiff, on the other hand, testified that she has failed multiple nursing certification assessments specifically because she does not understand sufficient English. Pl. Dep. 57:20–60:17.

Separately, Defendant and Plaintiff hotly contest what happened at the termination meeting on January 20, 2023. Spatichia and Latella, two of the Defendant employees at the meeting, testified that they explained the Separation Agreement to Plaintiff, including that she could consult with a lawyer, had forty-five days to review it, and seven days to revoke after execution. Spatichia Dep. 36:2–37:3; Latella Dep. 48:3–50:7, Def. Ex. 9, ECF 22-13. They also did not recall Plaintiff indicating she did not understand the agreement. After receiving the agreement and reviewing it, they said, she signed. Spatichia Dep. 43:13–18.

Plaintiff on the other hand, recounted a far grimmer scenario. According to her, Plaintiff told Spatichia and Latella she did not understand the agreement. Pl. Dep. 162:17–163:6. In response, they told her that her signature was required so she could receive pay for unused vacation days. Pl. Dep. 123:15–125:22. In Plaintiff's account, neither Spatichia nor Latella told her that she

5

had forty-five days to decide, seven days to revoke, nor the right to consult with counsel. Pl. Dep. 116:14–117:9. Rather, Latella and Spatichia told her she had to sign the agreement that day and could not leave the office without signing. Pl. Dep. 167:10–22. After signature, Plaintiff also testified that she was not given a copy of the agreement to bring home with her. Pl. Dep. 130:15–131:12, 138:6–11. So, in Plaintiff's version of events, Defendant essentially gave her a sign-now-or-never choice, misrepresented the terms, and failed to offer any assistance when Plaintiff explained she could not understand the agreement.

## II.     PARTY CONTENTIONS

The disputed issue is narrow, but potentially dispositive. Defendant argues that Plaintiff knowingly and voluntarily signed the Separation Agreement. Applying the totality of circumstances test adopted by the Third Circuit, Defendant contends that the terms were clear, Plaintiff had sufficient knowledge and background to understand them, was not pressured into signing on the spot, had the opportunity to seek counsel and negotiate the terms, and ultimately freely chose to waive her claims in exchange for bona fide consideration, her severance pay. Def. Mot. Summ. J. at 1–2

Plaintiff responds that she did not knowingly and voluntarily sign the agreement. Rather, she vehemently argues that she did not understand the terms of the agreement—most importantly her forfeiture of civil actions—and that Defendant's representatives materially misled her about the terms of the agreement when she confessed her inability to comprehend the contract. Pl. Resp. at 1. Further, she says she was told she had to sign the agreement that day and was not advised to speak to a lawyer. Id. at 1–2.

## III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

### IV.     DISCUSSION

The validity of a release of Title VII or ADA claims "does not end with the evaluation that would be applied to determine the validity of a contract." Coventry v. U.S. Steel Corp., 856 F.2d 514, 523 (3d Cir. 1988). Rather, "[i]n light of the strong policy concerns to eradicate discrimination in employment, a review of the totality of the circumstances, considerate of the particular individual who has executed the release, is also necessary" to determine if the wavier was

"knowingly and voluntarily" entered. Id. at 522–24. Thus, a court must go beyond finding the releasee was "competent enough to read and understand [the contract's] literal meaning," but also contemplate at least seven factors. Id. Those are:

> (1) the clarity and specificity of the release language;
> (2) the plaintiff's education and business experience;
> (3) the amount of time plaintiff had for deliberation about the release before signing it;
> (4) whether plaintiff knew or should have known his rights upon execution of the release;
> (5) whether plaintiff was encouraged to seek, or in fact received the benefit of counsel;
> (6) whether there was an opportunity for negotiation of the terms of the Agreement; and
> (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

Cirillo v. Arco Chem. Co., 862 F.2d 448, 451 (3d Cir. 1988), reversed on other grounds. Part of the totality analysis, includes "whether there is evidence of fraud or undue influence, or whether enforcement of the agreement would be against the public interest." W.B. v. Matula, 67 F.3d 484, 497 (3d Cir. 1995). And given the "fact-bound nature of these questions, many of which go to a person's state of mind, summary judgment holding the execution of a release was voluntary or knowing may be inappropriate." Id.

Here, two of the seven factors indisputably favor Defendant. The language of the Separation Agreement clearly states that, upon execution, the releasee would give up her rights to sue under Title VII and the ADA. See Cuchara v. Gai-Tronics Corp., 129 F. App'x 728, 731 (3d Cir. 2005). And the consideration exchanged, two-weeks of severance pay, was an additional benefit that Plaintiff's at-will termination did not otherwise provide. Romero v. Allstate Ins. Co., 1 F. Supp. 3d 319, 404 (E.D. Pa. 2014) (describing additional benefits, "however minimal" are

adequate consideration so long as they "constitute[ ] something more than what Plaintiffs were entitled to" without agreement) (Buckwalter, J.).

But a proper knowing and voluntary inquiry cannot take a "myopic view of what may have actually occurred." Id. at 406. The record, viewed most favorably to Plaintiff, shows that Plaintiff was not competent to understand the terms of the agreement, and was actively misled when she admitted her incomprehension. It is true that "[i]n the absence of fraud, the fact that an offeree cannot read, write, speak, or understand English is immaterial to whether an English-language agreement . . . is enforceable." Morales v. Sun Constructors, Inc., 541 F.3d 218, 220 (3d Cir. 2008). But by the same token, denying an individual who clearly cannot understand a written contract the opportunity to review terms, or have it translated vitiates the very principles of mutual assent required for contract formation. Mikeladze v. Raymours Furniture Co., Inc., 2020 WL 7240379, at *5 (E.D. Pa. Dec. 8, 2020) (DuBois, J.) (no contract formation if non-English speaker was "not allowed to take the Agreement home to review and have translated") (internal quotations and citations omitted); see also Solis v. ZEP LLC, 2020 WL 1439744 at *5–6 (S.D.N.Y. Mar. 24, 2024) (no mutual assent when non-English speaker did not have "meaningful opportunity to have the document translated.").

Applying Morales precludes summary judgment. Plaintiff testified that she told Latella and Spatichia that she did not understand the agreement, and in response, they misrepresented its contents. Instead of accurately explaining the terms, Plaintiff says, they told her that she needed to sign the agreement to receive pay for unused vacation days, and that she had to do so before leaving the office. In reality, of course, the agreement was for severance pay in exchange for giving up her civil rights, and granted Plaintiff forty-five days to review before accepting or rejecting. Verbal misrepresentations of terms in an agreement establish fraud in the execution of a contract and are

9

admissible evidence to prove the validity of formation. Interwave Tech., Inc. v. Rockwell Automation, Inc., 2005 WL 3605272, at *16–17 (E.D. Pa. Dec. 30, 2005) (Pratter, J.) (summarizing Pennsylvania precedent's distinction between fraud in the inducement versus fraud in the execution and recognizing that parol evidence is admissible for claims of the latter).[2] And even if Latella and Spatichia had not affirmatively misrepresented terms, Plaintiff testified they gave her no meaningful opportunity to review the contract in light of her admitted incomprehension, nor a copy to take home to translate. Mikeladze, 2020 WL 7240379, at *5.

What's more, Morales itself is a more demanding threshold than Plaintiff needs to meet here—Morales and its progeny address how English proficiency affects the fundamental validity of contract formation, which the Third Circuit has explicitly held is too permissive a framework in the civil rights release context. Coventry, 856 F.2d at 524. Whether an individual is "competent enough to read and understand" a contract's "literal meaning . . . is not enough" to enforce the waiver at bar. Id. Rather, the key question is whether Plaintiff's signature was knowing and voluntary. Certainly, her inability to understand the terms of the contract, which she says she made clear to Defendant, undercuts that her signature was "knowing."

The remaining five factors all present genuine, and serious disputes of material fact. Plaintiff's ability to understand the contract is hotly contested (factor two). And according to her testimony, she had essentially no-time to deliberate before signing the contract (factor three), was not encouraged to speak to a lawyer (factor five), was unable to negotiate terms in the contract (factor six), and was unaware of the rights she was forfeiting (factor four). See Cole v. Gaming

---

[2] The Third Circuit has also explained that "[f]raud in the execution applies to situations where parties agree to include certain terms in an agreement, but such terms are not included. Thus, the defrauded party is mistaken as to the contents of the physical document that [she] is signing. Parol evidence is admissible in such a case only to show that certain provisions were supposed to be in the agreement but were omitted because of fraud, accident, or mistake." Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1300 (3d Cir. 1996).

Ent., L.L.C., 199 F. Supp. 2d 208, 214 (D. Del. 2002) (finding that failure to orally advise employee of right to counsel and giving employee only until end of day to sign agreement weighed the third, fifth, and sixth factors in plaintiff's favor). It bears repeating that the terms of the agreement, however clear, do not control because, Plaintiff testified that she confessed to Defendant that she could not understand them and was not given a chance to translate them before being told to sign. Her extensive testimony about how her limited English affected her job performance, training sessions, and post-New Hudson nursing studies—buttressed by Henry Songa's corroboration—is more than adequate to place her English comprehension in the factual, not legal, gauntlet of trial.

V.   **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is **DENIED**.[3]

---

[3] Having found that genuine disputes of material fact preclude finding that the waiver was knowing and voluntary, this Court declines to address Plaintiff's alternative argument that she signed the release under duress.

11